## LEE HUGHES V. THE STATE.

### *No. 7379.    Decided June 10.*

1. **Murder — Charge of the Court.** — Where the evidence does not present the issue of murder in the second degree the charge of the court need not submit the law of that grade of homicide to the jury.

2. **Same—Evidence.**—See the statement of the case for circumstantial evidence held sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Washington. Tried below before Hon. C. C. Garrett.

The following is the evidence in full adduced on the trial of the case,. as the same appears in the record:

W. D. Crockett, for the State, testified: I am the constable at Chappell Hill Precinct No. 2, of Washington County, Texas, where Charlotte Hughes, the deceased, was killed. The news of the killing was heard in the town of Chappell Hill the night of the day it occurred. The killing occurred on Friday, January 30, 1891. I went with the justice of the peace to the house of defendant early next morning, which was on Saturday. There was an inquest held by the justice of the peace on the spot at once, and after examining all the witnesses the verdict was. that Lee Hughes, the husband of Charlotte Hughes, the deceased, had killed her, and he was at once arrested by me. Hughes was present at the inquest and testified, and made no resistance to the arrest. He had made no attempt to escape either before or since his arrest. Hughes denied that he had killed his wife, said he did not know who did it without it was old man Berjinski, a Polander and foreigner who lived near the house of the defendant, where deceased and defendant lived in a negro cabin. Hughes and the deceased (his wife) are negroes. I knew them. He is about 25 years old and his wife was some years younger. The defendant lives about three miles from Chappell Hill, between that place and Brenham, in Washington County, Texas, on Mr. Chadwick's place. When I got out to the cabin where the killing occurred I examined the dead woman carefully. She was lying on her stomach with arms outspread, her head turned kind of sideways, her neck was nearly cut in two and nearly severed from her body by a deep gash which extended from the back of the neck to the swallowing part of the throat. There were also two deep gashes in her head and two in her shoulder. The wounds in her shoulder seemed to have been made after she was knocked down, as there were two gashes made by an ax in a wooden box which was setting by her head and shoulder. She seemed to have been knocked down and killed by the first lick of the ax. The ax had blood on the handle. Her shoes had mud on them, dried, as if she had just come in from the yard. It was a rainy day. I found a common clay pipe by her side, near her mouth, which was nearly smoked out. The tobacco used in it was plug tobacco cut up. I found a sharp ax used for cutting wood, very bloody, lying on the floor by a wood box. There were a lot of chips scattered over the hearth at the woman's feet. Her clothes, which were those worn by a negro woman, were undisturbed and were not in any way torn. Her dress was up just below the knees. There were no evidences of any struggle either before or after the fatal blows. There was in the fireplace a skillet resting on two chunks of wood, in which there was a pone of uncooked corn meal which had dried up. On a pan on a table near

the fireplace were some raw slices of bacon cut up. The floor was very bloody, collected near the middle of the house. At the inquest I carefully examined the clothes of the defendant, both upper and underclothes. I found no blood on them anywhere. Defendant at the inquest had on two undershirts of wool and one overshirt of wool, all of a light gray color. They were clean. They were not dirty. His clothes had the appearance of having been recently put on. The defendant, when I asked him how long he had had them on, said he put them on the Sunday night before the killing and had not changed since. The shirt defendant had on buttoned up and did not have any strings in it to take the place of buttons. The house of Lee Hughes is about ten yards from the road that leads by it. The road is a field road through the plantation. On defendant's hat I noticed a spot of blood about the size of a dime. It was in front and above the hat band and below the crown. It had the appearance of a smear of blood placed there by the finger, and was fresh and recently dried. Defendant when questioned how it came there said his hat, which was a large stiff white hat marked "cowboy," had fallen off the night before in the house where his wife lay dead, and that he supposed that the blood had in some way gotten on it; that his hat fell off while he was lifting up from the floor Anna Tasker, who had fallen when she saw so much blood. I am well acquainted with the location of the place where the murder occurred. The justice of the peace took no physician with him and no physician attended the inquest or ever looked at the woman. Defendant's examining trial was held on the following Monday, February 2, and I put him in jail.

On cross-examination by defense, Crockett said: I did not examine the dead woman's body to see if she had been raped.

Re-cross by the State: To the witness, by the State's attorney: "Were there any indications of a rape or robbery of the house?" The witness said: I saw none whatever of either, nor heard of any. The house of Lee Hughes, defendant, is a little box cabin about fourteen by sixteen feet, one door in the east, one window in the west side, and chimney in the north end.

W. H. Campbell, for the State, testified: I am the justice of the peace at Chappell Hill and held the inquest over the dead body of Charlotte Hughes. I held it early on the morning of Saturday, January 31. After hearing the evidence I had Lee Hughes arrested for the murder on the spot.

[It is agreed by the State and defendant's attorney that this witness testified substantially to the same facts that W. D. Crockett did, having examined the body of the deceased and the clothes of defendant and the surroundings. This witness also testified he held an examining trial of Lee Hughes on February 2, and remanded him to jail without benefit of bail.]

The State then introduced the voluntary statement of the defendant, Lee Hughes, taken at the examining trial held February 2, 1891, before W. H. Campbell, justice of the peace, which reads as follows, to-wit:

*The State of Texas v. Lee Hughes.*—Examining trial of Lee Hughes for the murder of Charlotte Hughes, before W. H. Campbell, justice of the peace for Precinct No. 2, Washington County, Texas, sitting as examining court. Lee Hughes, the defendant, being duly warned by the magistrate that the evidence given might be used against him, and asked if he desired to make a statement, said he did, and voluntarily said as follows:

All I know about it was that on that morning Rich Herndon was there for breakfast. There was not enough bread. She cooked more. We all ate then. She told him to fill her pipe and he did it. Rich then left. After he had gone I started, and she said she was going to her mother's. I told her to go on then. I then left, and when I came back found her dead. That is all I know about it.

Cross-examination: My wife was killed on Friday, the 30th of January, 1891, in Washington County, Texas. We had no children living with us. I had been married about six years, living together all the time except for about a month, about three years ago, she went to Brenham. Rich came to my house before breakfast. I told my wife to cook more. She did, and Rich ate breakfast with us. We got up when the sun was about an hour and a half high. It was cloudy and rained so I could not work. Only intended to shell a little corn to go to mill. Rich Herndon left after breakfast. He staid about an hour after breakfast. Said he was going down to Uncle Bill Jets' after his saddle. No one else came to the house that I know of. Rich had not gone more than about twenty yards when I left. I went to the pasture, about thirty yards off. Rich Herndon went across the field. My house is in a field about twenty yards from the neighborhood road leading out to the public road. My house I think fronts east. The road runs on the right hand side of my house. I crossed the road and went south to Louis Warren's house, about a half mile away as near as I can come at it. I let Mr. Martin, a Polander, with another Polander through the gate out of the pasture. I walked in the pasture till I got to the gate. I went by Mr. Egemot's house down the hill and took the road leading to the right, going toward Louis Warren's house. When I got there I told them good morning and sat down. At Louis Warren's house I found Hiram Robertson, my father-in-law, Louis Warren, his wife, and their children. Hiram Robertson said he was going to Rich Herndon's. I told him there was no use, as Rich ate breakfast at my house and had just left there before I left. Hiram then went off down in the bottom. I asked Hiram if he would let his boys shell me a peck of corn. He said he would let them shell a half bushel for me, and I

said I wanted that much. I staid there till sundown; did not leave the house or go anywhere else. Louis went to haul wood and his children were looking at an old geography with me. He did not come back to dinner. I heard him cutting wood in the branch about two hundred yards off. I ate by myself some greens and potatoes out of a pot just before sundown. There is a clear space between my house and Warren's, but Warren's is under a hill and my house can not be seen from his. The sun was about down when I got home. I left my wife at home when I left there. I did not meet anybody when I was returning to my house from Warren's. My house is a box house, with one room, with one door and one window. When I returned the door lacked about a foot from being closed. The door faced east. The window in the west on the side was just a slide plank window. It was open when I got home. There was a hole in the door for a chain to be locked. I had a padlock. It was not locked when I returned. I do not know where the lock was. Do not know where it is now. When I left the key was in the lock. When I left the door was partly shut. My wife kept it shut, as the wind was blowing. It dragged on the floor when shut or opened; had cut the floor partly in a groove. It was light enough to see when I got home; the sun was just down. When I opened the door I saw blood on the floor first. Then I ran and hallooed, "Oh, Rose! Somebody has killed my wife." I did not see her; did not want to look for her. I threw up my hands and ran crying and hallooing down the road to Rose, who was my wife's sister. I saw so much blood my heart flew in my mouth and I ran hallooing. I had been waiting for her at Louis Warren's—was expecting her before sundown. When she goes to her mother's she always comes back by Louis Warren's. I saw Susan Williams first. Carried Susan up to my house to see it, but she would not stay. She afterward went back with a little boy and staid till I went to Louis Warren's. Tried to get O'Neal's horse but could not catch him, then ran over there on foot, and brought them to see how my wife was killed. I would not go in because I was so scared. Louis Warren and his wife and all the children came back with me. Rose, my sister-in-law, went in and I ran in and brought her out. Neither I nor anyone else touched her that I know of. When I went in her feet were in the fireplace, her head two or three feet from the sofa, lying on her stomach. She was killed with my ax by being chopped in the head. The ax was sharp. The ax that morning when I left was in the house on the wood. When we all got back the ax was lying by her head, like the one who killed her had just dropped it down by her. It was dark and I lit a lamp. She was cut in the back of the neck. It looked like her head was nearly cut off. I had no money or other valuables in the house. Only had one pair jeans pants, one top shirt, like the one I have on, and three undershirts knitted. Had a cap in my trunk. My wife had clothes in the trunk. I only

had one pair of drawers in it and the cap. I changed my clothes and put on the ones I have on now the Sunday night before she was killed. Did not touch my wife. I went out of the house. I went back to bring my sister-in-law out and dropped my hat. Some one brought it out to me. Do not remember who it was. Have not changed my clothes since. Did not have a coat on at the time. Do not own but one coat. I now have on a blue coat, ragged, one woolen shirt, one knit undershirt, striped pants, coarse brown wool, and boots, large, wide brim white hat, same one I had on when my wife was killed, silk lining and branded "Cowboy," rather old, bought in cotton picking time last year. I do not know who killed my wife. On Sunday before my wife was killed there was a row at Berjinski's house between some Polanders. Martin was one of them, the other I do not know. Berjinski's house is about one hundred yards from mine. Martin came to my house and asked me for my gun. Berjinski was after him with a gun. My wife got the gun and would not let him have it. It was a muzzle-loader shotgun. It was at home when she was killed but was not loaded. Berjinski came about half way to my house, stopped a while, then turned and went back. Martin kept asking me for the gun, but my wife told him no, the gun should not go out of the house. I let Martin through the fence. He rode off, then came back and said, "You will be my witness; you are a good looker. I am going to report him for trying to kill me." My wife had no enemies that I know of. The only one I know of who could have killed her was the Polander on account of this. My wife's clothes were not pulled up—just about as they would have been from falling.

"I, W. H. Campbell, justice of the peace in and for said precinct, sitting as an examining court in the above case, do certify that the said defendant, Lee Hughes, did execute and sign before me, as such examining court, the foregoing as his voluntary statement before the examination of any witnesses in said case, and after I had informed him that if he did make a voluntary statement it might be used in evidence against him.

"Witness my signature on this the second day of February, 1891.

"W. H. CAMPBELL, J. P. W. C."

Rich Herndon, for the State, testified: I went over to Lee Hughes' the morning of the 30th of January, the day of the murder. I got there about an hour by sun. [The State here introduced an almanac intended for Texas, showing that on January 30, 1891, the sun rose at 6.48 a. m., or twelve minutes before 7 o'clock, and set at 5.12 p. m.] I found Lee Hughes (the defendant) and his wife Charlotte at home. They were just going to breakfast. I ate breakfast with them. There was no one there but us three and no one came while I was there. We then ate up all the victuals they had cooked. It would require more

cooking to have another meal. I staid in all about an hour at Lee Hughes'. Just before I left Charlotte said she was out of tobacco and asked me for some tobacco. I then cut some tobacco for her pipe from my plug tobacco and filled her pipe and gave it to her. She lit it and was smoking it when I left, which was shortly afterward and after breakfast. The pipe she was smoking was a common clay pipe. [Here a common clay pipe with blood on it was shown the witness, and he, after examining it, said it was the same pipe he filled for Charlotte Hughes that morning and the one she was smoking.] I left Lee Hughes' about 9 o'clock to the best of my knowledge. I have no time-piece and don't know the exact time. The school bell was ringing at Chappell Hill and they take in school there between 8 and 9 o'clock. Lee Hughes had no timepiece at his house. Lee Hughes nor his wife said anything about going anywhere while I was there. We all talked about things in general. I am certain that nothing was said by Charlotte Hughes about her going over to her mother's, Easter Washington. Lee Hughes said nothing about going over to Louis Warren's. The weather that morning was cloudy and drizzling rain. It cleared up about the middle of the day. When I started to leave Lee got his hat and went to the door as if to leave. He was standing in the door when I left. I passed out of the door by him. He did not leave while I was there. I never saw him leave. I went from Lee Hughes' house down in the bottom and staid down there until evening, about 3 o'clock. I came back the road by Lee Hughes' house and passed his house. There was no one there and everything was quiet. The door, which was the only one to the cabin, was shut to and seemed to be locked. The lock was in the chain. I was at the inquest and testified that the overshirt Lee Hughes had on there was not the same one he had on the morning I left his house. The day that I was at his house he had on a woolen overshirt with strings in it, and it had been on for some time and was dirty. The shirt he had on at the inquest was clean and had no strings in it. He had changed his shirt.

Hiram Robertson, for the State, testified that he was at Louis Warren's the morning of the murder. I got there between 10 and 11 o'clock in the morning. Louis Warren, his wife and three children were there. Mrs. Washington was there also. Lee Hughes got there after I was there awhile. I left Louis Warren's about ten minutes after Lee Hughes came there, and went down the road to the bottom and passed Lee Hughes' house. It would take me about five minutes to ride from Louis Warren's to Lee Hughes' house. The houses are about half a mile apart. I passed Lee Hughes' house about fifteen minutes after he got to Louis Warren's house. I saw no one around the house; it was quiet around it. The chain was pulled through the door and it was locked. The door locked with a chain and pad-lock. I passed along the road within fifteen yards of the door which

faced the road.  I am positive the door was locked.  I passed back by the house that evening about 4 o'clock and the door was still locked, just as I saw it that morning.  Lee Hughes and his wife would get along well for a while and then they would quarrel and he would whip her.

Cross-examination by defendant:  I rode along the road on a horse. I did not get out of the road.

West Washington, for the State:  I am the father of Charlotte Hughes, deceased.  I went from my house to Louis Warren's on the morning of the killing.  [The plat introduced in evidence was here shown to witness, who says that it shows the situation of the house correctly.]  I got there about a half or three-quarters of an hour by sun, to the best of my knowledge.  I had no timepiece.  I staid at Louis Warren's two hours or more.  Lee Hughes and Hiram Robertson came there while I was there.  Myself, Lee Hughes, Hiram Robertson, Louis Warren, his wife and children, were there that morning.  I intended to go to my daughter's house, where defendant lived.  I asked defendant where Charlotte was and he said she had gone over to her mother's (my house.)  It would have been out of the usual way to go from defendant's house directly to my house.  When I asked him where Charlotte was he had been there about fifteen minutes.  I staid about half an hour longer after I asked him this.  I can't tell exactly the time when I left Louis Warren's.  There was no timepiece there.  Louis Warren and I left together.  Louis went to the branch to cut wood and I went on down the road to the bottom.  I went past defendant's house in going to the bottom.  I thought the door of Lee Hughes' house was locked.  I would have gotten down and gone in if the door had not have looked like it was locked.  The house was near the road—about ten or fifteen steps from it.  I saw no one about the house.  I went down in the bottom and came back by a different route home.  Got there about 12 o'clock. I asked my wife if Charlotte had been there that morning and she said no.  I was riding horseback.  It is not more than a half mile from Warren's house to defendant's house.  Charlotte didn't come to my house that day.  I didn't see her again until after dark.  She was at her house, killed.  Defendant and she lived disagreeably together.  He treated her badly.  We had to protect her.  She left him once.  I told him if he didn't want her to bring her back to my house.  I told him because he was abusing her.  They had no children at home—lived alone. She had one child by another man, which child lived at my house.

Cross-examination by defendant's attorney:  It was three years ago when I saw Lee abuse his wife.  Don't think I am mistaken.  I think the door was locked.  My daughter had been coming over pretty often to see her child.  She didn't stay any time.  She was afraid of defendant.  She appeared sometimes to pass, come in and go through the house and leave.  I didn't cut wood in the same place as Louis War-

ren.   Defendant once before this told me he was going to give Charlotte a damned good whipping, and I told him to bring her back before he whipped her.   He didn't bring her back and she didn't come.   She was afraid to do so.

Louis Warren, for the State:   I saw Charlotte Hughes Friday night after she was killed.   It was in Washington County, Texas, three miles from Chappell Hill.   It was about 9 o'clock when Lee Hughes came to my house.   He is my brother-in-law.   I married his half sister.   I had no timepiece and could not fix the time exactly when he came there. Old man West Washington and I started off at the same time.   He went up the road to the bottom and I went down to cut wood.   In about an hour I came back to the house.   Defendant was still there.   I had been in the woods cutting some time when the passenger train passed. The track is about a mile from my house.  · Don't know what time passenger train gets to Chappell Hill.   It was the train passing from Chappell Hill to Brenham.   [It is agreed by State and defendant's attorneys that the passenger train going from Chappell Hill to Brenham gets into Chappell Hill at 11:20 o'clock, and defendant's house is three miles from Chappell Hill toward Brenham.]   I was hauling wood all day long.   My wife was about the house.   Every time I would go to the house defendant would be there.   The sun was nearly down when defendant left my house.   It is not a long distance from my house to defendant's—not more than a half mile.   Defendant would come and stay at my house sometimes, but never all day at a time before this.   He seemed to be mighty lively that day; was livelier than usual, except when the sun went down.   When Hiram Robertson left my house that morning defendant asked which way he went.   I said he had gone by your house, and defendant said, "Lord, did he go by my house?"   I didn't know of the killing until defendant came back to my house and gave the alarm and said "Somebody has killed my wife."   He didn't say who killed her.   I and my wife and children went over to defendant's house then.   He said afterward that Berjinski, a Polander, had killed her.   Defendant did not make a complaint against Berjinski nor try to have him arrested.   I was among the first to get to defendant's house.   Found deceased lying on her stomach with her arms spread out. She was killed with an ax.   [This witness then described the wounds as heretofore described.]   A pipe was lying by her head and chips were lying on the hearth, as if fallen from her lap.   [Witness also identified the pipe as the one by deceased's head.]   If the door was closed to only about a foot wide, a person looking in could see her feet; don't think could hardly see the blood; don't know that you could see her feet.   The defendant ground the ax at my house a day or so before the killing occurred.   [Witness identified the ax as defendant's ax.]

Cross-examination by defendant's attorney:   I guess it was about 9 o'clock when defendant got to my house.   Lee got there before I ate

breakfast. Hiram Robertson was there while I was eating breakfast. Lee had on the same clothes that day they arrested him in. I can't tell exactly what color they were; don't recollect. I smoke plug tobacco. Sack tobacco burns a little faster than plug tobacco. The pipe found there had plug tobacco in it. Defendant told Hiram Robertson to tell his boy Dave to shell him a peck of corn, and Hiram said, "Don't you want more than a peck?" and he said, "Well, a half bushel." The children had traps set to catch birds that day. Lee was there all that day. I was fixing a potato pile. There were not many people at the body when I got there. The blood was clotted. She seemed to have been dead for some time. The body was cold. The stream of blood ran from her neck and ran down toward the south end of the room, and the blood was clotted. When defendant came back to my house he called me and said somebody had killed his poor wife. He caught me around the neck. I said, "Lee, who do you reckon done it?" He said he didn't know. He seemed to be crying, was hallooing. There was some bread on the fireplace in the skillet, not done, and some raw bacon sliced on the table. Hiram Robertson left before I went to the woods. Can't say how long it was after Lee got there before I went to the woods.

Peter O'Neal, for the State: I was at home on the day of the killing until about an hour and a half by sun in the evening. My house is about two hundred and fifty yards from defendant's, I think. He passed my house between 11 and 12. He had his hands in his pockets. I said good morning, and he said good morning in a very rough way. He didn't stop to talk, as he usually did. He was going toward Warren's. I did not see him pass back. I went back with the crowd, Lee and Warren's family, that night. When I got back to the house I found deceased lying on her stomach, her arms spread out, her head nearly severed from her body by a blow on the neck, a gash in her head and two on the shoulder. Some bread was in a skillet, partly cooked, in the fireplace; some raw bacon sliced on the table. Chips were lying scattered on the fireplace as if fallen from her lap. A clay pipe was lying near her mouth. [Witness identified the pipe in evidence as the same one he saw there.] Had tobacco in it partly smoked out. It was plug tobacco. A bloody ax was lying near by her body as if dropped by the one who struck her. She was cut with an ax. There was no blood on the handle of the ax. There was blood only on the sharp part of the ax. She appeared to have been dead for six or seven hours. Her body was cold and stiff. No doctor came there at all. The blood run off from the head and neck in a stream and settled in a pool. It was clotted. I didn't ask defendant any questions that night when we went to his house. It was dark when defendant, myself, and the Warren family got to the house. Defendant got fire and lit the lamp when

he and I went into the house. Defendant hallooed and went on saying that some one had killed his wife. He said he believed Berjinski killed her, after he had lit the lamp and after we had gone out doors and after the crowd had got there. Defendant was hallooing when he came past my house with the Warrens. He was not crying—seemed to be shamming. Old man West Washington, father of deceased, called me aside that night after viewing the body to talk to me. When we commenced talking defendant came up and interrupted us. Every time we'd commence talking he'd come up.

Cross-examined by defendant's attorney: The chain was not in the door when I got there that night. The door opens hard—makes a groove in the floor.

Sam Light, for State: I was at the house of the defendant next morning after the killing early. I talked with Hughes, the defendant, there. He said, "Your niece is killed," and I said "Who did it?" and he said, "the Polander, Berjinski, did it." I then said, "How came the Polander to kill her with your ax?" And he said because of the fuss. I told him I believed he did it. He said that he was mighty sorry that I believed that he did it. Lee Hughes and his wife did not get along well together. He abused her. She came to my house one day about two years ago crying, and said Lee had beat her over the head with a pistol.

Cross-examined by defendant's attorney: Defendant said the Polander Berjinski was mad because his wife was going to testify against him. Defendant asked me if I believed he did it, and said he was sorry. He didn't look sorry to me. I did not examine Charlotte's head when she said Lee beat her with the pistol.

Victoria Berjinski, for the State: My father is Valenta Berjinski. I live with my father. Was living with him when Charlotte Hughes was killed. Could see from our house to defendant's house. Saw her about 7 o'clock first. I saw her twice that morning. The first time I saw her it was after 7 o'clock. The second time was about two hours after this. I saw her in the pasture a short piece from the house under a tree, sitting down with a pipe in her mouth. I never saw her any more that day. Could have seen her if she had been round the house. I never saw her leave the house to go anywhere. My father was sick that day in bed. He never went away from home that day. About 2 o'clock he got up and put on his shoes to receive a man who came to see him. I didn't see defendant pass the house that morning. Father had been sick three days.

Rosetta Berjinski, for the State: I was at home the day of the killing of Charlotte Hughes. Didn't see deceased all day. Father had been sick several days—was in bed all day except in the evening. He got up to receive a man who came to see him. I didn't see defendant pass our house that day.

J. V. Busher, for the State: I know Lee Hughes, defendant, and Charlotte, his wife. Have known them for a long time. They lived on my place as tenants for some time. She was a quiet, peaceable girl. They didn't get along well. He was a quarrelsome man. They fussed a good deal.

Cross-examination by defendant's attorney: Can't recollect that I ever saw them in a fuss. Their conduct together was nothing unusual among negroes. Lee Hughes is subject to violent fits of passion, and when in a passion is a dangerous man.

William Mercer, for the State: I live near Chappell Hill. Defendant and wife were tenants of mine during the year of 1890. They left my place the last of December, 1890, and moved onto Chadwick's place. Had been living there about a month when Charlotte was killed. I was at the inquest of the dead body. I examined defendant's clothes. They were clean. Had not been worn long. I noticed a blood spot like a smear on his hat. It was between the hat band and the top of the hat. It could not have gotten there by dropping off in blood. Defendant said, when asked about it, that he had dropped it in the blood the night before. Defendant and wife fussed together. I saw him whip her one day with a rope doubled up. He ran her out of the house with it.

Cross-examination by defense: It is not an unusual occurrence for a negro man to whip his wife. Negroes frequently whip their wives.

George Warren, for the State: I am the son of Louis Warren. Was at home when Lee Hughes came over the day Charlotte was killed. Lee Hughes is my half uncle. I didn't see any blood spattered on his undershirt the day he came over to our house. I didn't see him sew his undershirt to his upper shirt to conceal blood on his shirt. I did not tell Susan Williams that I saw any such thing. I did tell her the next day after the killing that they said that defendant had blood on his sleeve and sewed it up when he came over to Louis Warren's that day. I live at Louis Warren's and was there the day Lee Hughes came. When I say "they" told me I do not recollect who the persons were that I refer to.

Cross-examination by defense: When I say "they" I mean the people, or it was the rumor. We were catching and cleaning birds all day, and Lee Hughes was helping us on the day of the murder.

Susan Williams, for the State: I talked with George Warren on Sunday at my house after the killing of Charlotte. He told me that when Lee Hughes came down to Louis Warren's house the day of the killing he (Lee Hughes) got a needle and thread from Mary Warren and sewed his top shirt and undershirt together to keep the blood from showing on the undershirt. He said the blood on the undershirt was in small spots as if sprayed on, just as blood would come from a chicken's neck when its head was cut off.

Easter Washington, for the State: I am the wife of West Washington and the mother of Charlotte Hughes, the deceased. Charlotte Hughes is dead. She was killed on Friday, January 30, 1891, in Washington County, Texas. Charlotte didn't come to my house at all the day she was killed. She did not get along well with her husband. He abused her. She left him once because he abused her.

Valenta Berjinski, for the State: I am the father of Victoria and Rosetta Berjinski. I live at the house indicated in the plat, a short distance from the house of Lee Hughes, the defendant. On the day that I heard Charlotte Hughes was killed I was sick and in bed until about 2 o'clock p. m. I don't know anything about the killing. I didn't see Charlotte Hughes or Lee Hughes the day of the killing. Didn't leave my house the day of the killing. Had been sick for several days.

Cross-examination by defense: Martin Organdvish and I had some words a few days before the killing of Charlotte Hughes. It was not a serious difficulty. Organdvish did not report me, and said nothing about it. I never reported him to the justice of the peace. I did not go to Lee Hughes' house for a gun. I wouldn't know Charlotte Hughes from any other negro woman. She and Lee had been there only a short while when she was killed. I saw defendant pass my house several times is the way I know him.

W. D. Crockett, recalled by the State: The west bound passenger on the Texas Central Railway going to Brenham passes Louis Warren's house about 11 or 11:30 o'clock a. m. Witness describing cabin where deceased was killed, said: There was one door in the cabin which opened to the south. The door was not in the center. The fireplace was in the east end of the cabin, the window in the west side of the cabin. Only one room was in the cabin. I don't think any one could see the body or blood unless the door was fully half open. Charlotte and Lee Hughes were negroes. They were poor. There was no indication of robbery, and I saw no indications of rape. There were no evidences of any struggle. The indications were that she fell dead at the first stroke of the ax.

Defendant then introduced the following witnesses, who testified as follows:

Martin Organdvish, for defendant: My house is about as located in the plat from Lee Hughes' house. My brother and I went horseback out of the gate as indicated in the plat. It was about 10 o'clock when we started. Looked at the clock just as we started. Don't think the clock had struck. Defendant Lee Hughes, as we got to the gate, came up and opened and shut the gate for us. The gate is about two hundred yards from my house as indicated in the plat. Defendant came up with his hands in his pockets. He went toward Louis Warren's after shutting the gate. I think the gate is about a quarter of a mile

from the house of defendant. I recollect having a quarrel with Valenta Berjinski. It occurred between O'Neal's and defendant's house. On Sunday morning before the killing was the day of the quarrel. The quarrel was in the road. I asked for them all to be witnesses, and defendant Lee Hughes answered, "I'll be one."

Cross-examination by State: At the time of the quarrel there were several negro women standing off some distance. I don't know whether Charlotte Hughes was there or not. I did not know her. I saw nothing of a gun that day. Berjinski had gone on in advance of me and some of the negroes told me he had a gun. I never told Berjinski I would report him to a justice of the peace, and I did not report him. I never tried to get a gun from defendant. I never asked defendant for a gun. He never gave me a gun.

Andrew Organdvish, for defense: I am the brother of Martin Organdvish. Was with him when defendant Lee Hughes opened the gate. It was about 10 o'clock.

Cootey Warren, for defense: I am the daughter of Louis Warren and Mary Warren. Defendant came to Louis Warren's house about 10 o'clock; don't know time exactly. I was there all day long. Defendant staid there all day long. He left about sundown. He was helping us catch birds. He also helped us clean them and cook them. He was just like he always was. He told my father Charlotte was going over to her mother's to carry her child some clothes. She usually came back by our house. Late in the evening defendant remarked he wished Charlotte would come on. Said she must have gone another way. Hiram Robertson staid about an hour after Lee came to our house, and then left. When Lee came back to our house that evening after sundown he was running and then walking, and said: "Oh, Lordie, somebody has killed my wife." He wept and cried and appeared much grieved. We went up to defendant's house. I was in the house with defendant. I did not see his hat fall off.

Cross-examination by the State: The defendant is my uncle. There was no clock at our house.

Louisa Warren, for defense: I was at home at Louis Warren's the day Charlotte Hughes was killed. I am Louis Warren's daughter. Lee came to our house about 10 o'clock, as near as I can come at it, and staid there all day long. He said nothing about Charlotte until late in the evening, when he remarked that he was looking for Charlotte to come back by there and go home with him. When he left he said nothing about Charlotte. He came back running after a while, and said "Somebody has gone into my house and killed my wife with my ax." We all went back with him. I did not notice his hat fall off in the house. I was there when Hiram Robertson got there in the morning. He left about an hour after Lee got there.

Cross-examination by the State: Lee helped us make fish traps. He scared the birds away from our traps. We caught some birds.

Mary Warren, for the defense: I am the wife of Louis Warren and half sister of defendant, Lee Hughes. Lee came down to my house, as near as I can recollect, about 10 o'clock on the day Charlotte was killed. He staid until sundown. There was nothing unusual in his manner. About an hour by sun he went to the west door and said, "I wish Charlotte would come by so I could go on with her." He came back that night after he left running and hallooing. I ran to meet him. Just before I got to him he fell and fainted, and I caught hold of him and raised him up and asked him what was the matter. He said "Somebody has killed my wife with my ax." He seemed very much distressed. Hiram Robertson staid about an hour after he came that morning. All of us went back with Lee to his house.

Cross-examination by the State: When Lee fainted he brought himself to. I did nothing to bring him to. I just grabbed him and asked him what was the matter.

George Warren, for the defense: I am the son of Louis and Mary Warren. I was at home all that day of the killing of Charlotte Hughes. Lee came to our house about 8 or 9 o'clock. He staid until about dark. Hiram Robertson was there when Lee got there. Hiram left about an hour after Lee got there.

Cross-examination by the State: Lee did not help us catch birds that day.

Susan Williams, for the defense: I live at Peter O'Neal's. Remember the day Charlotte Hughes was killed. Lee Hughes came as far as Berjinski's and called that evening. I went out. He said, "Somebody has killed Charlotte." He wanted me to stay and I would not do it. The door was pushed wide enough open to see feet and blood; could walk through without touching. I did not go in the house. Lee went in the house. He then went running down toward Louis Warren's.

Wallace Komiski, for the defense: I live in Chappell Hill, on Mercer's place. Was living there January 30, the day of the murder of Charlotte Hughes. About 3 o'clock in the evening I saw the house, and the door seemed to be about a foot open.

Cross-examination by the State: When I saw the door I was about four hundred yards from it.

Annie Williams, for the defense: I know defendant and Charlotte, the deceased. I staid with them last year. They moved off the place in December, 1890. Defendant had two woolen shirts. [Here defense produced a woolen shirt and witness did not recognize it as the shirt she knew.] The other shirt beside the one defendant has on had cords across the bosom. Lee and Charlotte got along pretty well while I

was with them.  They had two fights.  Nothing unusual for colored people to fight.

Willie Johnson, for the defense:  I know defendant and wife. Lived with them about a year.  I knew defendant to buy two woolen over-shirts.  [Here shirt defendant was wearing was shown witness and also another plain woolen shirt without cords across bosom, and witness said that they were the same color but one of the shirts defendant bought had cords across the bosom.  Neither of the shirts in evidence had cords about them.]

Cross-examination by the State:  When I lived with Lee and Charlotte Hughes he would beat and whip her.  She would not resist him.

Dan Taska, for the defense:  I know defendant and wife Charlotte. I lived near them.  Defendant had two woolen overshirts.  One was a, plain shirt, something like the one in evidence, and the other had cords across it.

Lee Hughes, for the defense, testified in his own behalf as follows:  I made a statement at the examining trial.  Rich Herndon came to my house the day Charlotte was killed as my wife was putting breakfast on the table.  I asked him to sit down.  He said he came for breakfast. Charlotte took a little something in her saucer and went to the fireplace to eat.  She told him to fill her pipe and pay for his breakfast, and Rich said he would pay her back when he went to town.  Rich said he had to go to old man Billy Yets'.  Rich passed me and went out the door.  I went down to Louis Warren's.  I found Hiram Robertson and my father-in-law there.  I coughed while there and Hiram asked me what was the matter, and I said nothing more than coughing.  When I got to Organdvish's I heard the school bell ring at Chappell Hill.  I staid at Louis' all day.  Charlotte had told me that she was going to her mother's.  I was waiting for her at Louis Warren's.  I told my niece at Louis Warren's when I left there in the evening to tell Charlotte to come on if she came by there.  Hiram Robertson said he was going to his sister Maria's.  I told him there was no use, as Rich had told me she'd gone to the bottom.  I went straight home from Louis. Warren's and found the door about a foot open at my house.  I pushed it open and looked in and saw so much blood I fell back and called sister.  I went and got Susan Williams, but she wouldn't stay.  I didn't get quite to Louis Warren's house when I ran and hallooed, "Somebody has killed my poor wife."  When I went in the house Rosa Taska was down on her knees, crawling, and I helped her up.  My hat then fell off there.  Don't know how the blood got on it.  The constable arrested me on Saturday.  I didn't try to run away.  I opened the gate that morning for Martin and Andrew Organdvish.

Cross-examination by the State:  I saw so much blood when I came to the door that evening I was satisfied she must be dead.  I didn't go in until I got Susan Williams.  Then I went in and saw the ax.  The

sun was about two hours high when Rich Herndon came to my house. He staid a little over an hour. I left just after Rich. After we all got through breakfast that morning there was a little bread left. Charlotte generally cooked my dinner before she went off anywhere. I did not stay about an hour after Rich Herndon left the house. When I was asked about who killed my wife I said I could not tell who did it, unless it was the Polander. The Polander said what was not so about not asking me for a gun, and about my wife being called on as a witness. My wife had no enemies that I know of. I saw no evidence of rape. My house was not robbed. I am now about 24 years old. My wife was younger. She left me two or three years ago. I told her father to move her to his house. Didn't whip her to amount to much. Didn't hit her over the head. I shoved the door open when I first got there. I didn't stay any time after Rich left. The lock was gone when I got back. The lock was in the door when I left in the morning. I did not leave the door locked. The key was not in the lock when I left. The door was shut that morning. If I said on the examining trial the key was in the lock I don't remember it. I never had Berjinski arrested, for I couldn't swear that he did it. I believe until yet he did it. Peter O'Neal said that night that Berjinski must have done it. I went the night of the killing after Peter said that Berjinski must have done it and got Peter's gun and started to Berjinski's. Louis Warren stopped me and told me I'd better not go, as no one knew who did it. The reason I took the gun and started to Berjinski is because I know that when a man's wife was found murdered in his own house and with his ax he would be held to account for it and people would say he did it unless he showed somebody else did it. I can't imagine who killed my wife unless it was Berjinski. I thought Berjinski did it because he didn't want my wife as a witness against him. The time Mr. Mercer says I whipped my wife with the rope was because she told me a lie about dinner being late.

Defense introduced a dark woolen shirt that had some threads in it, as if something, a cord or things, had been once tacked on it. It did once have cords across it.

No brief filed for appellant.

*R. H. Harrison*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—In this case the appellant was convicted in the lower court of murder in the first degree and the death penalty assessed. The victim of the murder was his wife. While the evidence is wholly circumstantial in character, we have been constrained after a mature consideration of the same to conclude, as did the court and jury at the trial below, that the defendant is guilty of murder in

the first degree, the murder of his wife, and under circumstances of peculiar enormity and atrociousness. While the State has been unable to show positively the immediate cause or motive for the killing, yet it is shown that he had been in the habit of mistreating his wife at times extending through the whole course of their marital relations. The evidence shows that the woman was killed by blows from an ax, her head being almost severed from her body, and there was no sign of any contest or struggle of any character about the room at the time her body was found. There are no bills of exception in the record to the admission or exclusion of testimony. The charge of the court is a full, clear, and complete presentation of the law applicable to the facts, and there was no error in refusing the special requested instructions, the law having been fully given in the general charge.

The evidence solely presented a case of murder in the first degree, and the court only submitted the issue of murder in that degree. Under such circumstances the court, where murder in the second degree is not raised or even suggested by the evidence, is fully warranted in declining or refusing to submit that degree to the jury. Caldwell v. The State, 28 Texas Ct. App., 566.

Defendant has had a fair and impartial trial, so far as the same is disclosed by the record before us, and there being no reversible error the judgment is in all things affirmed.

*Affirmed.*

Judges all present and concurring.